# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MARQUIS SOFTWARE SOLUTIONS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-CV-0372-B |
| JEFFREY ROBB, | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff's Motion for Temporary Restraining Order (TRO) and Preliminary Injunction (Doc. 5). Following a telephonic hearing held on February 26, 2020, the Court **GRANTED** Plaintiff's motion with respect to the issuance of a TRO.[1] This Order provides additional reasoning for the Court's decision and details the scope of the TRO.

## I.

## BACKGROUND[2]

This is a dispute arising from the alleged violation of a non-compete agreement. Plaintiff Marquis Software Solutions, Inc. provides "analytics software, services, and solutions for financial institutions nationwide." Doc. 1, Compl., ¶ 6. On November 19, 2018, Defendant Jeffrey Robb became Marquis's "SVP, Compliance Sales and Business Development." *Id.* ¶ 7. In this role, Robb's

---

[1] The Court does not decide Plaintiff's request for a preliminary injunction at this time.

[2] The facts are drawn from Plaintiff's verified complaint, the parties' briefing on the motion for a TRO, and the telephonic hearing. Any contested fact is identified as such.

duties included "managing and directly participating in virtually all sales for [Marquis's] financial institution compliance initiatives." *Id.* Due to the nature of his position, Marquis states, Robb received "highly-confidential information" about "all aspects of [Marquis's] customers and sales efforts nationwide" and Marquis's "proprietary new software." *Id.* ¶ 9. Specifically, Marquis states that it provided Robb with information about key client relationships; software pricing information; proposals to clients; information about clients' workflow process; training on using Marquis's new software; and client feedback on this new software. Robb, however, indicates that he "learned nothing at Marquis that wasn't available to anyone through their publicly available marketing materials." Doc. 13, Def.'s Resp., 1.

As a condition of his employment with Marquis, Robb entered into a Confidentiality and Non-Competition Agreement ("Agreement") with Marquis. Doc. 1, Compl., ¶¶ 11–12; *see* Doc. 1-1, Agreement, 1. This Agreement provided, among other obligations:

> **Non-Disclosure**. Both during and after [Robb's] employment with [Marquis], [Robb] will not disclose or deliver to anyone, whether employed by or outside [Marquis], except as expressly authorized by [Marquis], or use in any way other than in [Marquis's] business, any Confidential Information and any other information or material relating to the business of [Marquis] (including information or material received by [Marquis] from its customers) and intended by [Marquis] and its customers to be kept in confidence.
>
>     . . . .
>
> **Return of Confidential Information.** [Robb] will not make any copies of any Confidential Information except for use expressly authorized by [Marquis] in connection with the [Marquis's] business. [Robb] will return to [Marquis] all copies of Confidential Information (including, without limitation, all copies of any [Marquis] sofware) at any time upon the request of [Marquis] and, without such a request, upon [Robb's] termination of employment with [Marquis.]
>
>     . . . .

**Non-Competition Agreement**. . . . Therefore, in consideration of the Confidential Information, placement opportunity, training, and compensation provided to [Robb] and for other good and valuable consideration provided by [Marquis] to [Robb], the receipt and sufficiency of which are hereby acknowledged, [Robb] hereby agrees that during the term of [Robb's] employment with [Marquis] and for a period of one year following the effective date of any termination of said employment (the 'Termination Date') whether voluntary or involuntary, [Robb] shall not directly or indirectly, whether individually or as owner, partner, shareholder, manager, controlling person, agent, consultant or formal or informal advisor of any other person or entity, do any of the following:

> (a)     Engage in a business which creates for sale to others, sells, licenses, or otherwise provides computer software performing the same functions as or functions substantially similar to the software programs of [Marquis.]
>
> . . . .
>
> (c)     Sell or endeavor to sell to any customers or potential customers of [Marquis] as of the Termination Date whom [Robb] contacted or solicited while employed by [Marquis.]"

Doc. 1-1, Agreement, 2–3.

On December 16, 2019, Robb sent Marquis a written notice of his resignation. Doc. 1, Compl., ¶ 14. He ultimately informed Marquis that his last day of employment would be December 31, 2019. *Id.* ¶ 16. Though Robb was scheduled to have a meeting with Marquis's Chief Compliance and Client Experience Officer on December 23, 2019, Robb cancelled the meeting due to an emergency dental appointment. *Id.* ¶ 18. Thus, the officer instead sent Robb a copy of the Agreement to remind him of his post-employment contractual obligations. *Id.* The next day, Robb returned, via mail, his laptop issued by Marquis. *Id.* ¶ 19. But Marquis's Chief Technology Officer examined the laptop and discovered that Robb deleted data from the laptop, "thereby preventing [Marquis] from accessing its information . . . ." *Id.* ¶ 20. As a result of Robb wiping the laptop clean, Marquis states, it has no way of knowing whether he removed confidential information from the

laptop or how he did so. Robb insists that he did not delete all information from the laptop—rather, he deleted only some personal data such as his checking account information.

Subsequently, Marquis discovered that Robb was working as a Vice President of Compliance Sales for QuestSoft—an alleged competitor. *See id.* ¶¶ 21–26; Doc. 1-2, QuestSoft Names Jeff Robb as Vice President of Compliance Sales ("Press Release"), 1. Based on Robb's credit card charges and information from a third party, Marquis believes that Robb was training for employment with QuestSoft and meeting with QuestSoft while he was still employed with Marquis. Doc. 1, Compl., ¶¶ 21–25. QuestSoft, Marquis explains, is "unquestionably" Marquis's competitor, given that it "holds itself out as a 'leading provider of comprehensive compliance software and services for the banking, credit union, and mortgage lending industries.'" *Id.* ¶ 26 (citation omitted); *see also* Doc. 1-2, Press Release, 2.

According to a press release from QuestSoft, Robb is now "responsible for directing QuestSoft's sales of comprehensive products and services for its Compliance RELIEF platform." Doc. 1-2, Press Release, 1. Further, Marquis alleges that at a recent conference, Robb told an employee of Marquis that he formerly worked for Marquis, but was "now doing something similar" for another company. Doc. 1, Compl., ¶ 37. Now, however, Robb suggests that his role at QuestSoft is different than his role at Marquis: at QuestSoft, he manages others—he does not make sales.

In January of 2020, Marquis alerted both Robb and QuestSoft of Robb's alleged violations of his post-termination obligations under his Agreement with Marquis, as well as of Robb's "other misconduct." Doc. 1, Compl., ¶ 27. According to Marquis, QuestSoft responded by indicating that "Robb lied to [QuestSoft's] founder and CEO . . . about the existence of any non-competition agreement." *Id.* ¶ 33. Roughly one week later, Marquis explains, it again attempted to admonish

QuestSoft, but QuestSoft did not respond. *Id.* ¶¶ 34–35. Given the futility of its warnings, Marquis filed a lawsuit against Robb in this Court, bringing claims for: (1) breach of the non-compete provision of the Agreement; (2) breach of the confidentiality provision of the Agreement; (3) violations of the Computer Fraud and Abuse Act; (4) violation of the Defend Trade Secrets Act; (5) violation of the Texas Uniform Trade Secrets Act; (6) breach of the implied covenant of good faith and fair dealing; (7) breach of the duty of loyalty; (8) unfair competition; (9) unjust enrichment; and (10) conversion. *See id.* ¶¶ 38–107.

Moreover, Marquis now seeks a TRO that prohibits Robb from violating the Agreement with Marquis. Doc. 5, Mot. for TRO, 16. During the telephonic hearing, the Court clarified the scope of relief Marquis sought. Marquis stated that it sought a TRO restraining Robb from: (1) working for QuestSoft and any of Marquis's competitors, and (2) disclosing or using any of Marquis's confidential information. At the end of the hearing, the Court directed Marquis to file a proposed order with language detailing this relief. On February 26, 2020, Marquis did so. *See* Doc. 15, Notice of Proposed Preliminary Injunction Order. But Marquis included many provisions in the proposed order that went beyond the scope of restraining Robb from employment with a competitor or the disclosure of confidential information. The Court will not include these provisions in its TRO

Additionally, Marquis requests a hearing on its motion for a preliminary injunction before the expiration of 14 days after the entry of the Court's order on the motion for a TRO. *Id.* at 17.

On February 24, 2020, Robb filed a response to Marquis's motion for a TRO. *See* Doc. 13, Def.'s Resp., 1. One day later, this Court held a telephonic hearing for consideration of the motion. At the conclusion of the hearing, the Court granted Marquis's motion for a TRO. This Order further details the Court's reasoning for its decision.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). To obtain a preliminary injunction, a plaintiff must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000). "A temporary restraining order . . . is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that party seeking such relief to establish the same four elements for obtaining a preliminary injunction." *BNSF Ry. Co. v. Panhandle N. R.R. LLC*, 4:16-CV-1061-O, 2016 WL 10827703, at *1 (N.D. Tex. Dec. 30, 2016) (internal quotations omitted).

## III.

## ANALYSIS

A.  *Substantial Likelihood of Success on the Merits*

The Court concludes that Marquis has demonstrated a likelihood of success on the merits on its breach-of-contract claims. To demonstrate a likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (citation omitted). Marquis's request for injunctive relief is premised on two different claims—breach of the non-compete provision and breach of the non-disclosure provision. *See* Doc. 5, Mot. for TRO, 12,

13.

As a preliminary matter, the Court holds that Texas law applies to this dispute. "In federal question jurisdiction cases, where a court is exercising supplemental jurisdiction over state-law claims, a federal court also applies the choice of law rules of the forum state to the state[-]law claims." *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 511 F. Supp. 2d 742, 790 (S.D. Tex. 2005) (citations omitted). Here, Marquis asserts, and the Court agrees, that this Court has supplemental jurisdiction over Marquis's state-law claims because they arise out of the same facts as its federal claims. Doc. 1, Compl., ¶ 4; *see* 28 U.S.C. § 1367.

And in Texas, the forum state of this Court, "contractual choice-of-law provisions are typically enforced, unless the provision violates a fundamental public policy of Texas or the contract bears no reasonable relation to the chosen state." *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 749 (S.D. Tex. 2009) (citing, *inter alia*, TEX. BUS. & COMM. CODE § 1.301).

Here, the Agreement between Marquis and Robb states that its terms are to be interpreted in accordance with the laws of Texas. *See* Doc. 1-1, Agreement, 4. This provision does not appear to contravene any Texas public policy. Moreover, given that Marquis is incorporated and maintains its principal place of business in Texas, the Agreement between Marquis and Robb—a condition of Robb's employment with Marquis—is reasonably related to Texas. Thus, the Court holds that Texas law governs this dispute.

Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted).

The Court addresses Marquis's likelihood of success on the merits of its breach-of-contract claim premised upon a breach of the non-compete covenant below. Thereafter, the Court assesses Marquis's likelihood of success on the merits with respect to its breach-of-contract claim based upon a breach of the non-disclosure covenant.

### 1.    Breach of the non-compete covenant

The Court concludes that Marquis is likely to prevail on its claim that Robb breached the non-compete covenant. To determine the merits of Marquis's breach-of-contract claim based on Robb's violation of the non-compete covenant, the Court must first determine whether the non-compete covenant is enforceable. Under Texas law, a covenant not to compete is enforceable if:

> (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; and (2) the limitations of time, geographical area, and scope of activity are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

*Dig. Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 774 (N.D. Tex. 2012) (citing TEX. BUS. & COMM. CODE § 15.50). The burden of proof rests with an employer to show that the covenant meets these requirements. *Id.* (citing TEX. BUS. & COMM. CODE § 15.51(b)). The Court addresses elements (1) and (2) in turn below.

### i.    *Whether the covenant is ancillary to or part of an otherwise enforceable agreement*

To determine whether a non-compete covenant is ancillary to an otherwise enforceable agreement, the Court must: (1) "identify an 'otherwise enforceable agreement'" and (2) determine whether the covenant is ancillary to this agreement. *See Ray Mart Inc. v. Stock Bldg. Supply of Tex. LP*, 302 F. App'x 232, 236 (5th Cir. 2008) (per curiam) (citations omitted).

Turning to the first step of this inquiry, the Court must "set[] aside the noncompete covenant

and determin[e] whether any binding promises remain that would constitute an enforceable Agreement." *Id.*

Here, Marquis contends that there is an enforceable agreement between Marquis and Robb because Robb agreed not to solicit Marquis's customers for one year after his employment "in exchange for [Marquis] providing [Robb] with 'access to the confidential information and valuable trade secrets of [Marquis] and its customers.'" Doc. 5, Mot. for TRO, 10 (citing Doc. 1-1, Agreement, 1). Marquis alleges that Robb was "privy to [Marquis's] highly-confidential information[.]" *See* Doc. 1, Compl., ¶ 9. Moreover, during the telephonic hearing, Marquis explained that this information includes: information about key client relationships; software pricing information; proposals to clients; information about clients' workflow process; training on using Marquis's new software; and client feedback on this new software. Robb disputes this, contending that he did not learn any information that was not available to the public. Doc. 13, Def.'s Resp., 1.

Under Texas law, Marquis's promise to provide confidential information, even if executory, can create an enforceable unilateral contract if Marquis did indeed provide confidential information to Robb by the time that Robb left his employment with Marquis. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006) (holding that a non-compete covenant can be enforceable even if "the employer's promise is executory when made"). Marquis alleges that Robb was "privy to [Marquis's] highly-confidential information . . . ." *See* Doc. 1, Compl., ¶ 9.

Here, the Court finds that Marquis has offered prima facie evidence of an enforceable agreement independent of the non-compete covenant because Marquis has provided Robb with confidential information. Marquis has detailed specific information relayed to Robb during his employment with Marquis, such as information about clients and Marquis's strategy with respect to

specific clients. Though Robb suggests that he did not receive any confidential information during his employment with Marquis, the Court finds this highly unlikely given Robb's high-level position—Senior Vice President of Compliance Sales and Business Development—and Marquis's ability to articulate specific information provided to Robb. Additionally, the Court finds that Robb lacks credibility.[3] Accordingly, the Court finds that Marquis provided Robb with confidential information during the course of his employment and thus concludes that Marquis and Robb had an otherwise enforceable agreement.

Next, the Court turns to the second step of the inquiry—whether the non-compete covenant is ancillary to the otherwise enforceable agreement. This step requires the Court to assess whether two elements are satisfied: "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement." *Ray Mart Inc.*, 302 F. App'x at 237 (quoting *Alex Sheshunoff*, 209 S.W.3d at 649).

Here, the Court concludes that both elements are satisfied. First, Marquis's consideration—the promise to provide Robb with confidential information—gives rise to Marquis's interest in restraining Robb from competing. *See Drummond Am., LLC v. Share Corp.*, 692 F. Supp. 2d 650, 655 (E.D. Tex. 2010) (citation omitted); Doc. 5, Mot. for TRO, 10. Second, the non-compete covenant is designed to prevent Robb "from using the confidential information in

---

[3] QuestSoft's CEO indicated, via email, that Robb "assured [him] that he only signed a confidentiality agreement and not a non-compete." Doc. 10-2, Ex. B (Email Correspondence), 2. Further, Robb has no explanation for Marquis's claim that Robb deleted all of the data from his laptop before returning it to Marquis.

competition against [Marquis] after [his] departure." *See Drummond*, 692 F. Supp. 2d at 655 (citation omitted); Doc. 5, Mot. for TRO, 10.

Thus, the Court concludes that Marquis has satisfied its burden of showing that the non-compete covenant is ancillary to an otherwise enforceable agreement. Now, the Court examines whether the covenant contains reasonable limitations.

ii.     *Whether the covenant has reasonable limitations*

To enforce a non-compete covenant, the Court must find that the covenant's "limitations of time, geographical area, and scope of activity are reasonable . . . ." *Dig. Generation, Inc.*, 869 F. Supp. 2d at 774 (citing Tex. Bus. & Comm. Code § 15.50).

Here, the non-compete covenant at issue states, in relevant part:

> [Robb] agrees that during the term of [Robb's] employment with [Marquis] and for a period of one year following the effective date of any termination of said employment, whether voluntary or involuntary, [Robb] shall not . . . [e]ngage in a business which creates for sale to others, sells, licenses or otherwise provides computer software performing the same functions as or functions substantially similar to the software programs of [Marquis.]

Doc. 1-1, Agreement, 2. The covenant continues by prohibiting Robb from selling or attempting to sell to actual or potential customers of Marquis for one year following termination of his employment. *See id.* at 2–3.

First, the covenant's temporal limitation of one year is reasonable. Indeed, "Texas courts have generally upheld non-compete periods ranging from two to five years as reasonable." *Brink's Inc. v. Patrick*, 2014 WL 2931824, at *5 (N.D. Tex. June 27, 2014) (citations omitted).

Second, the lack of geographic restriction in the covenant does not necessarily "render the clause unreasonable." *See Le-Vel Brands, LLC v. Bland*, 2019 WL 4753041, at *7 (N.D. Tex. Sept.

30, 2019) (citation omitted). Marquis indicates that it provides software and expertise to "clients across the nation . . . ." Doc. 1, Compl., ¶ 6. And Robb does not contest this characterization. Given Marquis's nationwide reach, this Court "can reasonably infer" that the non-compete covenant "included an implied nationwide restriction." *See Le-Vel Brands*, 2019 WL 4753041, at *7 (concluding, based on an employer's capabilities to conduct business across the nation, that a nationwide restriction would be reasonable). And with such a restriction in place, the Court finds that the covenant contains reasonable geographic limitations.

But the third consideration—scope of activity—is more problematic. The non-compete clause includes two provisions that are likely unreasonable in scope.

<u>a.</u>    <u>Provision barring all employment with competitors</u>

The first problematic provision prohibits Robb from "[e]ngag[ing] in a business which creates for sale to others, sells, licenses, or otherwise provides computer software performing the same functions as or functions substantially similar to the software programs of [Marquis.]" Doc. 1-1, Agreement, 2. In Marquis's words, the covenant "prohibit[s] solely that activity which would otherwise be competitive with [Marquis] on behalf of a competitor." Doc. 5, Mot. for TRO, 12.

The scope of activity addressed by this non-compete clause, the Court concludes, is likely unreasonable because it purports to bar Robb from "[e]ngag[ing] in a business" similar to that of Marquis's, rather than working for a competitor in a specific capacity. *See Accruent, LLC v. Short*, 2018 WL 297614, at *6 (W.D. Tex. Jan. 4, 2018) ("The Court agrees . . . that noncompete agreements barring an employee from working for a competitor in *any* capacity are invalid.") (emphasis in original), *appeal filed*, No. 18-50075, Jan. 29, 2018; *Merritt Hawkins & Assocs., LLC v. Gresham,* 79 F. Supp. 3d 625, 641 (N.D. Tex. Jan. 13, 2015) ("A non-competition covenant 'must

bear some relation to the activities of the employee.'") (citation omitted).

Nevertheless, under Texas law, if a non-compete covenant is ancillary to an otherwise enforceable agreement, but unreasonably limits the scope of activity restrained, the Court may "reform the covenant to the extent necessary to cause the limitations . . . as to . . . scope of activity to be restrained to be reasonable . . . ." TEX. BUS. & COMN. CODE § 15.51(c). Further, "[s]ome Texas appeals courts have suggested, but not held, that reformation is appropriate at the temporary injunction stage." *TransPerfect Translations, Inc.*, 594 F. Supp. 2d at 756 (citations omitted); *see Accruent*, 2018 WL 297614, at *6; *see also McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 856 (W.D. Tex. 2016) (reforming an agreement to prohibit an employee "from providing services to a competitor that are similar to those that she provided to [her former employer]" at the preliminary injunction stage).

Here, as requested by Marquis, see Doc. 5, Mot. for TRO, 12, the Court opts to reform the non-compete covenant based on the current evidence, but only for purposes of resolving Marquis's motion for a TRO.[4] *See, e.g., TransPerfect Translations, Inc.*, 594 F. Supp. 2d at 756. To create a reasonable limitation as to the scope of activity prohibited by the non-compete covenant, the Court reforms Paragraph 5(a) of the covenant as follows:

> (a)    Engage in a business—*in a role related to the sale, licensing, or provision of compliance software to financial institutions, or a role otherwise substantially similar to Jeffrey Robb's role as Senior Vice President of Compliance Sales and Business Development for Marquis*—if the business creates for sale to others, sells, licenses, or otherwise provides computer software performing the same functions or functions substantially similar to the software programs of

---

[4] Accordingly, this reformation is not binding upon the parties for purposes of Marquis's motion for a preliminary injunction, nor for the resolution of any future dispositive motions. If the parties seek an alternative reformation, they should be prepared to argue it at the preliminary injunction hearing.

[Marquis].

Doc. 1-1, Agreement, 2–3 (Court's reformed language in italics).

With this limitation in place, the Court concludes that the scope of activity prohibited by this clause is reasonable, because the covenant relates to Robb's activities at Marquis. *See Merritt Hawkins & Assocs.,* 79 F. Supp. 3d at 641 (citation omitted).

### b. Provision barring solicitation of all potential and existing customers

Additionally, the scope of the provision barring Robb from contacting all customers and potential customers of Marquis is likely unreasonable. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont, 2004, no writ) (citations omitted) ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable.").

But Marquis's motion seeks to restrain Robb from "contact with customers or potential customers of [Marquis] *with whom [Robb] had contact* while employed by [Marquis.]" *See* Doc. 5, Mot. for TRO, 16–17 (emphasis added). With this limitation—namely, barring Robb from contacting only those with whom he actually had contact while working for Marquis—the solicitation provision would be reasonable. *See Expo Grp., Inc. v. Castillo*, 2019 WL 4671511, at *6 (N.D. Tex. Sept. 25, 2019) (finding a covenant reasonable where it restrained a former employee from soliciting only the clients with whom the employee worked).[5]

---

[5] The Court notes that Marquis did not request relief related to Robb's contact with customers during the telephonic hearing. Nonetheless, because Marquis requested such relief in its motion, specifically in conjunction with its request to enjoin Robb from working for any competitor of Marquis, see Doc. 5, Mot. for TRO, 16–17, the Court will include relief related to Robb's solicitation of customers. But the Court limits this relief to bar Robb from contacting customers of Marquis with whom Robb had contact, in accordance with the language in Marquis's motion. *See id.* at 17.

Accordingly, as long as both of the unreasonable non-compete provisions are enforced in a more limited fashion, Marquis has demonstrated prima facie evidence of an enforceable and reasonable non-compete covenant.

### B.   Likelihood of success on remaining breach-of-contract elements

Further, Marquis has established a substantial likelihood of success on the merits with respect to the remaining elements of its breach-of-contract claim: performance, breach, and damages.

### i.   Marquis's performance of the Agreement

As to performance on the contract, Marquis indicates that it has "entrusted [Robb] with continually developing [c]onfidential [i]nformation, including but not limited to competitive information regarding [Marquis's] customers, [Marquis's] growth strategies, sales, and pricing data . . . ." Doc. 1, Compl., ¶ 40. The Court has already found that Marquis did indeed provide Robb with such confidential information, though Robb contests this. *See supra* section III.A.1.i. Accordingly, the Court concludes that Marquis has performed on its promise in the Agreement to "share with [Robb] certain trade secrets and other confidential and proprietary information . . . ." *See* Doc. 1-1, Agreement, 1.

### ii.   Robb's breach of the non-compete covenant

Moreover, Marquis has offered prima facie evidence that Robb breached the reformed non-compete covenant. Specifically, Marquis states that Robb terminated his employment on December 31, 2019, and he began employment with QuestSoft on January 7, 2020—at the latest. *See* Doc. 1, Compl., ¶ 16; Doc. 1-2, Press Release, 1. Further, Robb's position at QuestSoft is Vice President of Compliance Sales, meaning he "will be responsible for directing QuestSoft's sales of comprehensive

products and services for its Compliance RELIEF platform." Doc. 1-2, Press Release, 1. And QuestSoft, according to its press release, is "the leading provider of comprehensive software and services for the mortgage, bank, and credit union industries." *Id.* at 2.

Under these circumstances, Marquis has shown a substantial likelihood that Robb is now "[e]ngag[ing] in a business" through a role involving the sales of compliance software to financial institutions,[6] and this business "creates for sale to others, sells, licenses, or otherwise provides computer software performing the same functions or functions substantially similar to the software programs of [Marquis.]" *See* Doc. 1-1, Agreement, 2. Thus, Robb likely breached the reformed non-compete covenant.

### iii.    Damages

Finally, Marquis has shown a substantial likelihood of damages suffered as a result of this breach, as explained below in the Court's discussion of the substantial threat of irreparable injury.

### 2.    Breach of the non-disclosure covenant

Based on the facts presented, the Court finds that Marquis is likely to succeed on its claim that Robb breached the non-disclosure covenant, too. Below, the Court analyzes each element of Marquis's breach-of-contract claim premised upon Robb's breach of the non-disclosure agreement.

### A.    *Existence of a valid contract (the Agreement) between Marquis and Robb*[7]

---

[6] To the extent Robb argues that he is now managing others, rather than participating in sales, this is a distinction of no consequence—he is managing and directing others who sell compliance software.

[7] Under Texas law, a non-disclosure covenant is not subject to the same analysis as a non-compete covenant, unless the non-disclosure covenant, in effect, "prohibit[s] the former employee from using, in competition with the former employer, the general knowledge, skill, and experience acquired in former employment." *See Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.—Dallas 1992, no writ.) (emphasis omitted) ("[B]ecause nondisclosure covenants are not restraints on trade, reasonable time,

Here, Marquis has offered prima facie evidence that Marquis and Robb entered into a contract that prohibits Robb from "disclos[ing] or deliver[ing] to anyone, whether employed by or outside [Marquis], except as expressly authorized by [Marquis] . . . any Confidential Information and any other information or material relating to the business of [Marquis] . . . and intended by [Marquis] and its customers to be kept in confidence." Doc. 1-1, Agreement, 2. In exchange, Marquis agreed to provide Robb with confidential and proprietary information during his employment with Marquis. *Id.* at 1. Thus, there is likely a valid contract between the parties regarding the disclosure of confidential information.

### B. *Marquis's performance on the Agreement*

Further, as noted above, Marquis has demonstrated performance on the contract, given that Marquis has "entrusted [Robb] with continually developing [c]onfidential [i]nformation, including but not limited to competitive information regarding [Marquis's] customers, [Marquis's] growth strategies, sales, and pricing data . . . ." Doc. 1, Compl., ¶ 40; *see also supra* Section III.A.1.i. Thus, Marquis has demonstrated its performance of the Agreement.

### C. *Robb's breach of the non-disclosure covenant*

Next, Marquis has shown a substantial likelihood of a breach by Robb. Though Marquis has not offered evidence that Robb has *already* breached the non-disclosure provision, a temporary injunction is a "proper remedy where an employee has breached, *or is in such a position that it is likely that he will breach*, a confidentiality agreement." *Evans Consoles, Inc. v. Hoffman Video Sys.*, 2001 WL 36238982, at *9 (N.D. Tex. Dec. 6, 2001) (emphasis in original) (citations omitted).

---

geographical, and scope-of-activity limitations are not prerequisites to enforceability.").

Here, Robb and QuestSoft are both, according to the facts before the Court, companies that provide data analytics software for financial institutions. *See* Doc. 1, Compl., ¶ 7; Doc. 1-2, Press Release, 2. Moreover, Robb's position with Marquis appears to be very similar to his current position at QuestSoft: both roles confer the responsibility of overseeing sales for financial compliance products. *See* Doc. 1, Compl.,¶ 7; Doc. 1-2, Press Release, 1. In light of these similarities, the Court finds that Robb is now in a position that makes him likely to breach the non-disclosure provision. *See TransPerfect Translations*, 594 F. Supp. 2d at 757 ("Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work.").

Additionally, the fact that Robb erased all information from his laptop provided by Marquis before returning the laptop to Marquis provides at least some support for the Court to infer, at this stage of proceedings, that Robb is likely to misuse confidential information from Marquis. *See* Doc. 1, Compl., ¶¶ 19–20. Thus, the Court finds that Marquis has demonstrated the likelihood of a breach of the non-disclosure provision by Robb.

> D.    *Damages*

Lastly, as discussed below in the Court's examination of irreparable harm, Marquis has shown a substantial likelihood of damages that will result from the breach of the non-disclosure provision.

B.    *Substantial Threat of Irreparable Injury*

Marquis has demonstrated a substantial threat of irreparable injury absent this Court's granting of an injunction. In order to establish that there is a substantial threat of irreparable injury, Marquis must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *TRAVELHOST, Inc. v. Figg*,

2011 WL 6009096, at *4 (N.D.Tex. Nov. 22, 2011) (citation omitted). This is a heavy burden to overcome, and mere speculative injury will not suffice. *Id.* "While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *Dig. Generation Inc.*, 869 F. Supp. 2d at 778 (citation omitted).

Numerous federal courts in Texas have held that harm arising out of a breach of a non-compete covenant is the "epitome of irreparable injury." *See, e.g.*, *Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F.Supp. 688, 693 (N.D. Tex.1996); *Amerispec, Inc. v. Metro Inspection Serv., Inc.*, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001).

Here, Marquis contends that it will face irreparable harm absent an injunction due to the potential for Robb to divert Marquis's customers and exploit Marquis's confidential information for QuestSoft's benefit. *See* Doc. 5, Mot. for TRO, 14.

Under the circumstances presented, this Court agrees. Specifically, as discussed above, Robb's role with Marquis is very similar to his role at QuestSoft—a company that directly competes with Marquis. These facts suggest a likelihood that Robb will disclose confidential information. *See TransPerfect Translations*, 594 F. Supp. 2d at 757 ("Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work."). And the "loss of confidential information is a harm that is difficult to verify and to quantify." *Oxford Glob. Res., Inc. v. Weekly-Cessnun*, 2005 WL 350580, at *3 (N.D. Tex. Feb. 8, 2005) (citation omitted).

Further, the parties themselves recognize the serious harm that the breach of the Agreement could cause, given that Robb expressly agreed in the Agreement that Marquis would have the right

to a preliminary injunction in order to enforce the non-competition provisions. *See* Doc. 1-1, Agreement, 3–4.

Thus, the Court concludes that Marquis has shown a substantial threat of irreparable injury absent an injunction.

C.    *Whether Threatened Injury Outweighs Harm of Injunction*

Next, the Court holds that the "threatened injury outweighs any harm the injunction might cause [Robb.]" *Enrique Bernat F., S.A.*, 210 F.3d at 442. As discussed above, Marquis faces a potential for irreparable harm absent a TRO. And as Marquis pointed out at the hearing, Robb has significant experience in the compliance industry. Under the TRO Marquis seeks, Robb is not prohibited from using this experience and knowledge to earn a living. Rather, he simply cannot do so through a similar job with one of Marquis's competitors for one year following the termination of his employment with Marquis. Under these circumstances, the Court finds that the injury Marquis faces absent a TRO outweighs the potential harm to Robb.

D.    *Impairment of Public Interest*

Finally, the Court holds that granting the requested injunction will not disserve the public interest. "It is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed[.]" *Amerispec, Inc.*, 2001 WL 770999, at *6. Here, in accordance with the public interest, this Court opts to uphold the parties' contract and recognize their Agreement that "[Marquis] shall be entitled to enjoin the actual or threatened breach" of the clauses at issue. *See* Doc. 1-1, Agreement, 3–4.

# IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Marquis's motion (Doc. 5) insofar as Marquis seeks a TRO against Robb. Accordingly, the Court **ORDERS** that, **up to and including March 11, 2020,** Defendant Jeffrey Robb:

a. cease and refrain from directly or indirectly—in a role related to the sale, licensing, or provision of compliance software to financial institutions, or a role otherwise substantially similar to Jeffrey Robb's role as Senior Vice President of Compliance Sales and Business Development for Marquis—providing services to, or on behalf of, any direct competitor of Marquis. A direct competitor is a business that creates for sale to others, sells, licenses or otherwise provides computer software performing the same function as or functions substantially similar to the software programs of Marquis. Marquis's direct competitors include, but are not limited to:

        i. QuestSoft Corporation
        ii. RATA
        iii. Wolters-Kluwer
        iv. Asurity Technologies
        v. TRUEPOINT Partners (now known as NContracts); and
        vi. ComplianceTech;

b. cease and desist from directly or indirectly disclosing, utilizing, using, or assisting anyone in obtaining or using Marquis's confidential information;

c. cease and desist from directly or indirectly contacting or otherwise communicating with any actual or potential customer of Marquis with whom Jeffrey Robb had contact while employed by Marquis.

Further, the Court sets a hearing to determine the merits of Marquis's motion for a preliminary injunction (Doc. 5) for **Friday, March 6, 2020, at 2:00 pm central standard time**. Finally, the Court directs the Clerk to mail a copy of this Order to:

        Jeffrey Charles Robb
        6651 Cliffside Drive
        Vermilion, OH 44089

SO ORDERED.

SIGNED: February 27, 2020.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE